1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RICHARD O'HEARN, individually
and on behalf of all others similarly
situated,

Plaintiff,

v.

LES SCHWAB WAREHOUSE
CENTER, INC. and LES SCHWAB
TIRE CENTERS OF WASHINGTON,
INC.,

Defendants.

C13-2005 TSZ

ORDER

13    THIS MATTER comes before the Court on plaintiff's motion for class

14 certification, docket no. 20.  Having reviewed all papers filed in support of, and in

15 opposition to, plaintiff's motion, the Court enters the following order.

16 **<u>Background</u>**

17    Defendant Les Schwab Tire Centers of Washington, Inc. ("Les Schwab") operates

18 114 stores in Washington.  Hueske Decl. at ¶¶ 2 & 4 (docket no. 25).  Les Schwab is

19 affiliated with defendant Les Schwab Warehouse Center, Inc. ("LSWCI"), but neither

20 defendant is the parent or subsidiary of the other.  *See id.* at ¶ 2; Corporate Disclosure

21 Statement (docket no. 8).  Les Schwab stores provide a limited range of parts and

22 services for motor vehicles, including replacement wheels and tires, as well as brake,

23

ORDER - 1

1    battery, and alignment services.  Hueske Decl. at ¶ 5.  Some Les Schwab stores focus

2    exclusively on passenger vehicles or "retail" customers, while others have a mix of

3    business, including maintenance of fleets, construction or logging equipment, commercial

4    trucks, and/or farm or ranch equipment, depending on location.  _Id._  Les Schwab has a

5    decentralized structure in which each store operates like an independent business, with a

6    store's management having almost complete control over how its own store is run.  _Id._ at

7    ¶ 12.

8         Les Schwab stores generally open at 8:00 a.m. six days a week, and close at 6:00

9    p.m. on weekdays and 5:00 p.m. on Saturdays.  _Id._ at ¶ 6.  The hours may vary by store

10   and as a result of weather or business conditions.  _Id._  Prior to January 1, 2013, Les

11   Schwab stores generally had a Store Manager, one or more Assistant Managers, and

12   hourly positions in three departments, namely Sales & Service, Brake & Alignment, and

13   Sales & Administrative.  _See id._ at ¶ 8; O'Hearn Decl. at ¶ 8 (docket no. 22-19).  Store

14   Managers are entitled to four weeks of vacation per year, generally do not work every

15   other Saturday, and might be away from their stores for meetings, training, or other

16   business reasons; when the Store Manager is absent, an Assistant Manager supervises the

17   store.  _See_ Hueske Decl. at ¶ 19.

18        Until January 1, 2013, Assistant Managers were compensated on a salary and

19   profit-sharing basis, and were not paid for overtime.  _Id._ at ¶¶ 13, 32-33 (indicating that,

20   between November 2010 and December 2012, Store Managers and Assistant Managers

21   shared roughly 30-40% of the net profits of their respective stores); _see also_ Ex. Z to

22   Breckenridge Decl. (docket no. 21-32) (indicating that, on average, Assistant Managers

23

earned in excess of $80,000 per year).  Effective January 1, 2013, Assistant Managers became hourly employees, and the second and third Assistant Manager positions were eliminated.  Hueske Decl. at ¶¶ 32-34; _see_ Bodin Decl. at ¶¶ 4-5 (docket no. 22-3).

Les Schwab had been in the process of phasing-out the second and third Assistant Manager positions since 2008.  Hueske Decl. at ¶ 34.  In 2008, Les Schwab established a training program via which hourly employees could get promoted to Assistant Manager.  _Id._ at ¶ 21.  Under this program, a trainee would hold the newly created, hourly position of Sales & Service Professional for approximately two years, and then be eligible for promotion.  _Id._ at ¶¶ 21-22.  Thirty-six of the 114 stores in Washington now have a Sales & Service Professional.  _Id._ at ¶ 21.  When the remaining second and third Assistant Manager positions were eliminated in 2013, the individuals holding those jobs were allowed to work for one year as a Sales & Service Professional.  _Id._ at ¶ 34.  If, at the end of the transition year, they did not secure an Assistant Manager position, they could opt to work in the Sales & Service department.  _Id._  Many of them, including plaintiff Richard O'Hearn, elected instead to quit.  _Id._; O'Hearn Decl. at ¶ 5.

Plaintiff was a second Assistant Manager at Store No. 304, located in Bothell, Washington, from February 2005 until December 2012, and a Sales & Service Professional at the same store from January 2013 until July 2013, when he resigned.  O'Hearn Decl. at ¶¶ 3, 5, 8.  In this litigation, he makes three claims under three different Washington statutes, namely RCW 49.46.130, RCW 49.48.010, and RCW 49.52.050.  Complaint at ¶¶ 53-70 (docket no. 1).  The crux of his claims is that Les Schwab's Assistant Managers are not exempt from Washington's requirement that employees be

compensated at 1½ times their regular rate for work in excess of forty hours per week. _See_ RCW 49.46.130(1); _see also_ RCW 49.46.010(3).  In this motion, plaintiff asks the Court to certify a class of all Assistant Managers employed by Les Schwab stores in Washington during the three-year limitations period and until December 31, 2012,[1] who were classified as "exempt" from Washington's overtime pay regulations.[2]  _See_ Motion at 14 (docket no. 20 at 21).

Plaintiff suggests "[t]his has been done before."  _Id._ at 1 (docket no. 20 at 8).  He points to cases in Oregon and California in which a similar class was certified, and indicates that "it's Washington's turn."  _Id._  In support of his certification request,

---

[1] The Court does not view Les Schwab's decision to convert Assistant Managers to hourly employees, effective January 1, 2013, as an admission that, before then, they were incorrectly classified under Washington law.  _See Mitchell v. PEMCO Mut. Ins. Co._, 134 Wn. App. 723, 736-37, 142 P.3d 623 (2006).  In creating the Sales & Service Professional position in 2008, and beginning to phase out second and third Assistant Managers, Les Schwab was responding to the risks associated with its growth as a company, and attempting to more clearly delineate the responsibilities of managerial and non-exempt employees.  _See_ Ex. W to Breckenridge Decl. (docket no. 21-29 at 4).  In finally eliminating the positions of second and third Assistant Managers, and opting to compensate Assistant Managers on an hourly basis, Les Schwab and its sister companies operating in other states were collectively attempting to avoid the possibility of inconsistent results in different states, as well as the distraction, disruption, and costs of litigation.  _See_ Ex. Z to Breckenridge Decl. (docket no. 21-32 at 2).  Thus, as in _Mitchell_, in this case, the reclassification does not itself aid the Court in determining whether Les Schwab was previously operating in violation of RCW 49.46.130(1).

[2] Les Schwab has divided Washington into four areas, and each area has an "Area Store." Hueske Decl. at ¶ 8.  The Store Manager of an Area Store also has oversight responsibility for other stores in the area and is called an "Area Manager."  _Id._ at 17.  An Area Store has both an Assistant Manager and an Area Store Assistant Manager.  _Id._ at ¶¶ 8 & 17.  In a suit in Multnomah County Circuit Court, a jury found, pursuant to Oregon law, that an "executive exemption" applied as to Area Store Assistant Managers, but not to Assistant Managers, making the former, but not the latter, ineligible for overtime compensation.  Verdict, _Ellis v. Les Schwab Tire Ctrs. of Portland, Inc._, Ex. I to Hollingsworth Decl. (docket no. 24-1 at 207-08).  Plaintiff in this case was never an Area Store Assistant Manager, and he makes no claim concerning whether Area Store Assistant Managers should be paid for overtime.  _See_ Reply at 12 n.61 (docket no. 30 at 15).

ORDER - 4

1   plaintiff contends that the Oregon and California cases are analogous to this one, and that

2   Les Schwab and LSWCI collectively control "all aspects" of store operations through

3   detailed policies, manuals, and job descriptions, as well as training programs.  His basic

4   premise is that Les Schwab and LSWCI together ensured uniformity among all Assistant

5   Managers in Washington with respect to their daily activities, which did not qualify them

6   as "exempt" from overtime compensation.  Plaintiff argues that any variation in the

7   responsibilities of Assistant Managers from store to store did not alter the nature of their

8   "primary duty," which did not distinguish them from non-exempt, hourly employees.

9       Contrary to plaintiff's assertion, however, the order certifying an "overtime

10   subclass" in the Oregon case, _Ellis v. Les Schwab Tire Ctrs. of Portland, Inc._, Ex. H to

11   Hollingsworth Decl. (docket no. 24-1 at 185-203), which did not apply the standards for

12   class certification that govern in federal court, and which predated the United States

13   Supreme Court's decision in _Wal-Mart Stores, Inc. v. Dukes_, 131 S. Ct. 2541 (2011), is of

14   no persuasive value.  Indeed, in the Oregon case, unlike in this case, the five defendants

15   (only one of which, namely LSWCI, is also sued in this case) did not even dispute that

16   the commonality requirement for class certification had been met.  Order at 9 (docket

17   no. 24-1 at 193).  In addition, the two California cases on which plaintiff relies involved

18   classes certified solely for settlement purposes, _see_ Hueske Decl. at ¶¶ 27-29; _see also_

19   Stipulation at ¶ 2.7, _Rogers v. Les Schwab Tire Ctrs. of Cal., Inc._, Ex. E to Breckenridge

20   Decl. (docket no. 21-5 at 13) ("Defendant . . . denies that, for purposes other than the

21   settling of this Action, any part of this Action is appropriate for class treatment."), and a

22   third case from California, which was before the same judge as one of the two cases cited

23

ORDER - 5

1  by plaintiff, Hueske Decl. at ¶ 27, contradicts plaintiff's representation that certification

2  of the proposed class "has been done before," _see_ _Gerard v. Les Schwab Tire Ctrs. of_

3  _Cal., Inc._, Ex. G to Hollingsworth Decl. (docket no. 24-1 at 176-183).[3]

4         As a result, the Court now begins its analysis with the proverbial clean slate.

5  Having thoroughly reviewed the materials submitted by the parties, the Court concludes

6  that the record does not reveal the type of homogeneity among Assistant Managers

7  concerning their duties or the manner in which their duties were performed that would

8  justify certifying a class.

9  **Discussion**

10 **A.     Standard for Class Certification**

11        Rule 23 operates as "an exception to the usual rule that litigation is conducted by

12 and on behalf of the individual named parties only."  _Comcast Corp. v. Behrend_, 133 S.

13 Ct. 1426, 1432 (2013) (quoting _Califano v. Yamasaki_, 442 U.S. 682, 700-01 (1979)).  To

14 maintain a class action, plaintiff must "affirmatively demonstrate" compliance with

15 Rule 23.  _Id._ (citing _Wal-Mart_, 131 S. Ct. at 2551).  The prerequisites of Rule 23 are not

16 mere pleading standards, but rather are evidentiary thresholds.  _Id._  Thus, plaintiff bears

17 _____

18 [3] In _Gerard_, the proposed class consisted of Store Managers, as opposed to Assistant Managers,
   but the plaintiff's arguments in favor of class treatment were virtually identical to those being
19 made in this case.  Order at 3-4 (docket no. 24-1 at 179-80).  The _Gerard_ Court was "not
   persuaded that the issue of whether the managers were properly designated as exempt can be
20 determined purely on the basis of defendant's standardized policies or by the type of sampling
   proposed by plaintiff's expert."  _Id._ at 4 (docket no. 24-1 at 180).  Moreover, the _Gerard_ Court
21 was "not convinced that the issue of the propriety of each individual manager's classification is a
   matter of common proof.  The precise mix of duties a store manager will perform is driven by
22 factors that vary in each individual case."  _Id._ at 4-5 (docket no. 24-1 at 180-81).  As a result, in
   _Gerard_, class certification was denied with respect to the overtime claim.  _Id._

23

ORDER - 6

1   the burden of proving, not just simply alleging, that all four requirements of Rule 23(a)

2   are satisfied, and that the proposed class qualifies under at least one of the three

3   provisions of Rule 23(b).  *Id.*  Plaintiff in this case pursues certification solely under

4   Rule 23(b)(3).

5         Rule 23(a) mandates that plaintiff prove (1) the class is so numerous that joinder

6   of all members is impracticable; (2) questions of law or fact common to the class exist;

7   (3) the representative's claims are typical of the claims of the class; and (4) the

8   representative will "fairly and adequately" protect the interests of the class.  Fed. R. Civ.

9   P. 23(a).  In opposing plaintiff's motion, defendants focus on the second prong of the

10  Rule 23(a) analysis, arguing that plaintiff cannot establish the requisite commonality.

11  Defendants also challenge plaintiff's ability to meet the criteria of Rule 23(b)(3), under

12  which plaintiff must show the case involves "questions of law or fact common to class

13  members" that "predominate over any questions affecting only individual members" and

14  as to which "a class action is superior to other available methods for fairly and efficiently

15  adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

16  **B.**    **<u>Lack of Commonality</u>**

17        Commonality, within the meaning of Rule 23, requires plaintiff to demonstrate

18  that the claims of all class members depend on "a common contention" of such nature as

19  "is capable of classwide resolution."  <u>*Wal-Mart*</u>, 131 S. Ct. at 2551.  The test is whether

20  the determination of the truth or falsity of such common contention "will resolve an issue

21  that is central to the validity of each one of the claims in one stroke."  *<u>Id.</u>*  "What matters

22  . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of

23

ORDER - 7

1  a class-wide proceeding to generate common _answers_ apt to drive the resolution of the

2  litigation." _Id._ (emphasis in original, quoting Richard A. Nagareda, _Class Certification in_

3  _the Age of Aggregate Proof_, 84 N.Y.U. L. REV. 97, 132 (2009)).  The Court must "probe

4  behind the pleadings" and engage in a "rigorous analysis" as to whether the prerequisites

5  for a class action have been satisfied. _Behrend_, 133 S. Ct. at 1432.  The Court's inquiry

6  will necessarily "entail some overlap with the merits" of the underlying claims because

7  class certification considerations are generally "enmeshed" in the factual and legal issues

8  associated with the causes of action being pursued. _Walmart_, 131 S. Ct. at 2551-52; _see_

9  _also Behrend_, 133 S. Ct. at 1432; _Ellis v. Costco Wholesale Corp._, 657 F.3d 970, 981 (9th

10 Cir. 2011) ("[I]t is not correct to say a district court _may_ consider the merits to the extent

11 that they overlay with class certification issues; rather, a district court _must_ consider the

12 merits if they overlap with the Rule 23(a) requirements." (emphasis in original)).

13      In this case, although plaintiff frames a common question, namely whether Les

14 Schwab should have paid Assistant Managers for overtime prior to January 1, 2013, that

15 question cannot be answered on a class-wide basis. _See Ellis_, 657 F.3d at 981 ("[I]t is

16 insufficient to merely allege any common question . . . .  Instead, [a plaintiff] must pose a

17 question that 'will produce a common answer . . . .'" (citations omitted)).  Although

18 plaintiff's claims involve statutes and regulations that apply to all Assistant Managers,

19 the question of whether Assistant Managers must receive compensation for overtime

20 under those laws has no common answer because the duties of Assistant Managers vary

21 from store to store, depending in large part on their respective Store Managers.

22

23

ORDER - 8

1        **1.    Executive and Administrative Exemptions**

2        Under Washington law, "employees" must receive compensation at 1½ times their

3   regular rate for work in excess of 40 hours per week, unless a statutory exclusion applies.

4   _See_ RCW 49.46.130(1)&(2).  For purposes of the overtime law, the term "employee" is

5   defined to "exempt" a variety of individuals, including those "employed in a bona fide

6   executive [or] administrative . . . capacity."  RCW 49.46.010(3)(c).  Thus, if an Assistant

7   Manager qualified, during the proposed class period, under either the "executive" or

8   "administrative" exemption, then Les Schwab would not have been required to pay him

9   or her overtime, and all three of plaintiff's claims would lack merit as to that individual.

10        The Washington Department of Labor and Industries ("L&I") has defined an

11  "individual employed in a bona fide _executive_ capacity" to mean a person "who is

12  compensated on a salary rate of not less [than] $250 per week . . . and whose primary

13  duty consists of the management of the enterprise in which he [or she] is employed . . .

14  and includes the customary and regular direction of the work of two or more other

15  employees."  WAC 296-128-510(6).  Plaintiff does not dispute that, during the proposed

16  class period, he and other Assistant Managers received salaries exceeding $250 per week,

17  or that he and other potential class members customarily and regularly directed the work

18  of two or more other employees.  Rather, with respect to the "executive" exemption,

19  plaintiff contends that "management of the enterprise" was not his or other Assistant

20  Managers' primary duty.

21        L&I has defined an "individual employed in a bona fide _administrative_ capacity"

22  to mean a person "who is compensated on a salary or fee basis at a rate of not less than

23

ORDER - 9

1  $250 per week . . . and whose primary duty consists of the performance of office or non-

2  manual work directly related to management policies or general business operations of

3  his [or her] employer . . . which includes work requiring the exercise of discretion and

4  independent judgment."  WAC 296-128-520(4)(b).  Again, plaintiff does not disagree

5  that he made the requisite threshold salary.  Instead, with respect to the "administrative"

6  exemption, plaintiff asserts that the performance of office or non-manual work "directly

7  related to management policies or general business operations" and requiring "the

8  exercise of discretion and independent judgment" was not his or other Assistant

9  Managers' primary duty.

10        The job description for Assistant Manager, however, contradicts plaintiff's views

11  concerning his and other Assistant Managers' "primary duty."  The job description

12  indicates that the Assistant Manager supports the Store Manager (also known as the Tire

13  Center Manager) in "all aspects of store management and operations."  Ex. U to

14  Breckenridge Decl. (docket no. 21-27).  The Assistant Manager is "responsible for

15  meeting sales, marketing, and financial performance goals; operating in compliance with

16  Company standards, policies, procedures, and federal, state, and local laws; supervising

17  all Tire Center employees; monitoring activities in the service bays; taking action to

18  prevent and resolve safety issues as necessary; and performing technical duties (for

19  example, tire/wheel repair and installation) as needed to train employees, demonstrate the

20  use of tools/equipment, intervene and correct unsafe work procedures, and provide

21  assistance in the service bays."  *Id.*

22

23

ORDER - 10

2. **Declarations Submitted by Plaintiff**

Although the job description for Assistant Manager reflects a role that satisfies the requirements of both the "executive" and "administrative" exemption, plaintiff argues that, in practice, Assistant Managers spend the bulk of their time performing the same work as hourly employees. Plaintiff offers, in addition to his own declaration, evidence from 23 other former Assistant Managers and two current Assistant Managers. _See_ Exs. 1-26 to Berman Decl. (docket no. 22).[4] One of the two current Assistant Managers states that he does "very little in terms of managerial tasks" and spends his "entire day" doing the same job as an hourly employee. Medcalf Decl. at ¶¶ 14, 15, & 18 (docket no. 22-18). The other current Assistant Manager indicates that, in addition to performing many of the same tasks as hourly employees, he creates a daily budget, removes and then returns the till to the safe each day, deals with the cash on hand, submits daily reports to

---

[4] Plaintiff also relies on various policies and manuals, but none of them support plaintiff's theory that Assistant Managers performed predominantly non-managerial work. _See_ Sherry Decl. at ¶ 4 (docket no. 26) (indicating that Les Schwab has never maintained a policy or practice requiring Assistant Managers to devote the majority of their time to non-managerial activities). Neither the policy manual, Ex. P to Breckenridge Decl. (docket no. 21-22), nor the code of conduct, Ex. G to Breckenridge Decl. (docket no. 21-7), enumerate the daily tasks of Assistant Managers or specify how managerial duties should be shared between Store Managers and Assistant Managers. _See_ Sherry Decl. at ¶¶ 6-8 & 11. The operations manual, which plaintiff did not actually submit, _see_ Ex. Q to Breckenridge Decl. (docket no. 21-23) (appending only the table of contents), has long been obsolete, and stores have been advised not to use or rely on it, _see_ Sherry Decl. at ¶ 12. The training materials proffered by plaintiff, Ex. M to Breckenridge Decl. (docket nos. 21-13 through 21-19), are aimed at Sales & Service Professionals, who are hourly employees, and their supervisors, who must certify that they have satisfactorily completed the instructional program. Other documents submitted by plaintiff address specific topics like customer credit or accounting, Exs. R & T to Breckenridge Decl. (docket nos. 21-24 & 21-26), or administrative matters like reimbursement for business expenses, dress codes, and termination procedures, Ex. S to Breckenridge Decl. (docket no. 21-25). If plaintiff's voluminous materials contain a directive to Assistant Managers concerning how they should spend their time each day, plaintiff has failed to cite it, and the Court has not independently discovered it.

ORDER - 11

1  Les Schwab headquarters, assigns employees to specific vehicles needing service and to

2  other duties, runs credit reports, and handles customer complaints.  Harper Decl. at ¶¶ 8,

3  12, 13, 14(b), & 15 (docket no. 22-10).  He is also involved in the hiring process, but has

4  not participated in firing any employees over the past three years or in any performance

5  reviews for the past year and a half.  _Id._ at ¶ 14.  In contrast to Medcalf's testimony that

6  he has virtually no managerial responsibilities, Harper estimates that he spends between

7  30 and 40 percent of his day on managerial activities.  _See id._ at ¶ 16.

8       Like Harper, and unlike Medcalf, the various former Assistant Managers whose

9  declarations have been offered by plaintiff describe duties that were entrusted to them

10 and not to hourly employees.  With one exception, each of the former Assistant Managers

11 provides an estimate concerning the amount of time devoted to purely managerial tasks,

12 ranging in value from 5 to 30 percent of the day.  _See_ Exs. 1-9, 11-17, 19-26 to Berman

13 Decl. (docket no. 22).  Some of these former Assistant Managers[5] represent that they

14 were not involved in the hiring, firing, or performance review process; however, most of

15 them, including plaintiff,[6] report playing a role in acquiring new employees, training and

16 _____

17 [5] _See_ Bodin Decl. at ¶ 13 (docket no. 22-3); Coe Decl. at ¶ 17 (docket no. 22-6); Harrison at ¶ 14
18 (docket no. 22-11); Palin Decl. at ¶ 14 (docket no. 22-20); _see also_ Lloyd Decl. at ¶ 13 (docket
   no. 22-17) (was involved in hiring before November 2010, but not afterwards).

19 [6] _See_ O'Hearn Decl. at ¶ 14 (docket no. 22-19); _see also_ Bawdon Decl. at ¶ 13 (docket no. 22-1);
   Blair Decl. at ¶ 18 (docket no. 22-2); Campbell Decl. at ¶ 17 (docket no. 22-4); Franklin Decl. at
20 ¶¶ 15-17 (docket no. 22-7); Grigsby Decl. at ¶ 16 (docket no. 22-8); Hardin Decl. at ¶¶ 12-14
   (docket no. 22-9); Hatt Decl. at ¶ 16 (docket no. 22-12); Heier Decl. at ¶¶ 17-19 (docket no. 22-
21 13); Heller Decl. at ¶ 12 (docket no. 22-14); Larson Decl. at ¶ 18-21 (docket no. 22-15); Lewis
   Decl. at ¶ 17 (docket no. 22-16); Pedder Decl. at ¶ 16 (docket no. 22-21); Reynolds Decl. at ¶ 12
22 (docket no. 22-22); Thornhill Decl. at ¶ 15 (docket no. 22-23); Uptegrove Decl. at ¶ 13 (docket
   no. 22-24); White Decl. at ¶ 12 (docket no. 22-25); Willard Decl. at ¶ 15 (docket no. 22-26).

23

supervising hourly workers, and/or discharging individuals when necessary for financial

or other reasons.  Similar to Harper and many of the former Assistant Managers, plaintiff

indicates in his declaration that he also engaged in the following managerial activities:

preparing daily reports, opening the till in the morning and storing it in the safe each

night, preparing the daily deposit, running credit reports, and approving or denying credit

applications.  O'Hearn Decl. at ¶¶ 10, 15, & 16 (docket no. 22-19).  In addition, plaintiff

states that he did manual labor to prepare the store for opening, including readying the

equipment, opening the service bays, and making coffee and popcorn, as well as to close

the store for the evening, including shutting down the equipment, putting away tools,

closing the doors, and performing janitorial tasks such as cleaning toilets, wiping

counters, and mopping or sweeping floors.[7]  _Id._ at ¶¶ 11 & 16.  According to plaintiff,

during the generally 12-hour workday, all but two hours of his time was spent "in the

---

[7] The extent to which Assistant Managers engage in janitorial work appears to vary from store to store.  Some stores incur the additional costs of outside cleaning services or dedicated janitorial employees.  _See_ Gonzalez Decl. at ¶ 14 & Wiggins Decl. at ¶ 24, Exs. 9 & 24 to Stafford Decl. (docket no. 27); _see also_ Graddy Decl. at ¶ 5, Ex. 10 to Stafford Decl. (indicating that the store has both a cleaning service and a part-time janitorial employee because the Store Manager and Assistant Manager "think investing in cleanliness is worthwhile in improving the image of the store and the quality of the customer experience" and in "set[ting] the right tone for our crew").  Other stores engage janitorial vendors on a part-time or seasonal basis.  _See_ Harrison Decl. at ¶ 11 (docket no. 22-11) (two days per week); Heier Decl. at ¶ 12 (docket no. 22-13) (three or four days per week); Hesner Decl. at ¶ 14, Ex. 11 to Stafford Decl. (all but two days per week); Ruetsch Decl. at ¶ 27, Ex. 21 to Stafford Decl. (full-time for nine months and part-time for the three slowest months of the year); Thueson Decl. at ¶ 14, Ex. 23 to Stafford Decl. (a cleaning service is contracted for all months except January and February, during which the person who cleans, either the Assistant Manager or one or more hourly employees, depends on how busy the store is); _see also_ Thornhill Decl. at ¶ 16 (docket no. 22-23) (explaining that, because the janitorial vendor did not service the bathrooms, the Assistant Manager cleaned the men's room, while an hourly employee cleaned the women's room).  At least one store relies exclusively on the Assistant Manager to keep things tidy.  _See_ Grigsby Decl. at ¶¶ 10 & 14 (docket no. 22-8).

1    bays or at the service counter performing the same tasks as the hourly employees." *Id.* at

2    ¶¶ 10, 16, & 17.

3          Defendants suggest that plaintiff's declaration is "entirely at odds" with his

4    deposition testimony, as well as with statements he made when applying for his current

5    job. *See* Response at 16 (docket no. 23 at 18).  In his deposition, plaintiff acknowledged

6    that he had managerial duties beyond those mentioned in his declaration.[8]  Moreover, in

7    seeking employment with Edward Jones as a financial advisor, plaintiff touted his

8    management experience with Les Schwab, indicating that he was responsible for

9    "meeting sales, marketing, and financial goals," supervising employees, developing

10   selling strategies and new customer accounts, managing customer credit accounts,

11   preparing and monitoring budgets, and resolving customer complaints.  Ex. E to

12   Hollingsworth Decl. (docket no. 24-1 at 157).  The Court draws no conclusion

13   _____

14   [8] Plaintiff agreed that, as Assistant Manager, he was responsible for ensuring that employees
     conducted themselves in a manner consistent with Les Schwab policies.  O'Hearn Dep. at 104:2-
15   10, Ex. A to Hollingsworth Decl. (docket no. 24-1).  Plaintiff also acknowledged that "an
     important part" of his job as Assistant Manager was training the crew.  *Id.* at 60:2-5.  Plaintiff
16   was required to stay abreast of new developments so that he could properly train his
     subordinates.  *Id.* at 79:3-19.  During the course of the day, he would quiz the workers as a way
     of helping them learn.  *Id.* at 252:7-253:1.  With regard to scheduling, plaintiff testified that, to
17   save on wages, he regularly sent employees home early when work was slow, generally after
     consulting with the other Assistant Manager and/or the Store Manager, depending on who was at
18   the store.  *Id.* at 124:6-126:1.  In addition, plaintiff set the monthly schedule, meaning that he
     determined which employees would start work on a given day at a particular time.  *Id.* at 185:7-
19   187:6.  If crew members were behaving improperly, plaintiff would pull them aside, without
     needing to obtain the Store Manager's permission, and counsel them about how they could
20   improve.  *Id.* at 268:2-9.  Plaintiff also had responsibility for checking the accuracy of hourly
     employees' timesheets, *id.* at 269:25-270:3, and for reporting any on-the-job accidents, *id.* at
21   154:10-21.  *See also* Layson Decl. at ¶ 26, Ex. 14 to Stafford Decl. (docket no. 27-2 at 28)
     (indicating that Layson's role as Assistant Manager included completing workers' compensation
22   forms when employees got injured, and then subsequently ensuring that they worked within their
     medical restrictions).

23

ORDER - 14

1    concerning whether plaintiff's declaration is inconsistent with his deposition testimony

2    and/or prior statements, but observes that the questions raised concerning plaintiff's

3    credibility demonstrate the difficulty, in this particular case, of assessing the "exempt" or

4    "non-exempt" status of just one individual, let alone an entire class.

5        **3.    Declarations Submitted by Les Schwab**

6        In opposing plaintiff's motion for class certification, Les Schwab has submitted

7    declarations from 26 individuals currently employed as Assistant Manager, Area Store

8    Assistant Manager, or Store Manager.  _See_ Exs. 1-26 to Stafford Decl. (docket no. 27).

9    Each of the Store Managers was previously an Assistant Manager at a different store.[9]

10   Together, these declarations paint a vastly different picture than those provided by

11   plaintiff.  Rather than attempting to segregate managerial from non-managerial duties,

12   these declarants talk of "juggl[ing] a lot of balls and deal[ing] with everything all at

13   once" while an Assistant Manager.  Paxton Decl. at ¶ 12, Ex. 19 to Stafford Decl.; _see_

14   _also_ _id._ at ¶ 21 ("As an Assistant Manager, I could not focus on just one thing at a time

15   because whatever I was not paying attention to tended to 'catch on fire.'").  As one

16   current Store Manager explains, when he was an Assistant Manager, he "could not just

17   put [his] head down and work with 'blinders' on."  Ferrell Decl. at ¶ 20, Ex. 5 to Stafford

18   Decl.[10]  Rather, he had to "monitor everything that was happening in the bays" and make

19   _____

20   [9] To become a Store Manager, an individual must first serve as an Assistant Manager and then
21   must apply to be placed on the "manager's list."  Hueske Decl. at ¶ 26.  Once on the "manager's
     list," the individual may "run" for an open Store Manager position.  _Id._

22   [10] _See also_ Wolf Decl. at ¶ 20, Ex. 26 to Stafford Decl. ("My core job as a[n Assistant M]anager
     was to manage the work to make sure it got done.  For example, if we told a customer we would

23

ORDER - 15

1  sure that employees stayed on task and were effectively communicating, while also

2  "watching customers' body language to see if they appear[ed] unhappy about something"

3  and then working to resolve any issues.  *Id.*  Similarly, a current Assistant Manager

4  indicates that, even when he is working on changing a vehicle's tires, he is still training --

5  he is simultaneously making sure that crew members are following procedures and asking

6  them questions to test their knowledge.  *See* Allcock Decl. at ¶ 15, Ex. 1 to Stafford

7  Decl.[11]

8       The declarations submitted by Les Schwab reflect that the role of an Assistant

9  Manager varies depending on the particular Store Manager.  For example, the Assistant

10 Manager at Store No. 330 in Cheney, Washington, has worked with two different Store

11 Managers.  Thueson Decl. at ¶¶ 2 & 5, Ex. 23 to Stafford Decl.  Thueson describes

12 working with the first Store Manager, Rich Reiman, as "trial by fire" because Reiman

13 simply said to him, "Here is your key.  This is your store.  You run it."  *Id.* at ¶ 17.

14 Reiman retired in 2011, and the new Store Manager, Brad Horst, has taken a more

---

16 have their car ready in twenty minutes, I would assign two employees to get the job done on
17 time.  I had to keep my head on a swivel and be aware of my surroundings at all times.  I did
   often work on cars myself when I was in the bays, but I tried to stay paired with another
   employee when I could because I constantly got pulled in other directions.").

18 [11] *See also* Amrhein Decl. at ¶ 17, Ex. 2 to Stafford Decl. ("I chose to work on cars or clean parts
   of the store myself from time to time . . . because it was important for employee morale . . . .  I
19 also sometimes needed to work on a vehicle as a training mechanism.  For example, if we got an
   unusual vehicle (like a Ford Model T), I would work on the car myself, but I would also train an
20 employee while I did so.  That way, the next time that employee would know how to handle the
   situation."); McManus Decl. at ¶ 15, Ex. 18 to Stafford Decl. ("I constantly look for training
21 opportunities for our crew. . . .  I try to quiz the crew in the bays when we aren't too busy.  I also
   do on-the-job training on sales skills . . . .  Sometimes this means having them try to sell me tires.
22 Other times it's me quizzing them about different types of tires and vehicles or showing them
   what needs to be done on a particular model vehicle.").

23

ORDER - 16

1    interactive approach.  *See id.* at ¶¶ 5, 12-22, & 30.  Horst and Thueson now meet two or

2    three Fridays a month for breakfast and discuss strategies for more effectively running

3    the store.  *Id.* at ¶ 13.  They work together on the hiring and performance review process,

4    on managing net profits on a daily basis, and on implementing crew training programs

5    and conducting store-wide meetings.  *Id.* at ¶¶ 13, 17-18, 26-30.  In contrast, when

6    Reiman was the Store Manager, Thueson had made all hiring decisions on his own, and

7    the store's profit had been managed on an annual basis, with less successful results.  *Id.* at

8    ¶¶ 18 & 19.  Other declarations offered by Les Schwab contain similar observations

9    about a change in supervision.  *See* Ruetsch Decl. at ¶¶ 6-8, Ex. 21 to Stafford Decl.

10   (indicating that the previous Store Manager had been "hands off" and that, because

11   Ruetsch had been used to running things on his own, he "initially butted heads" with the

12   replacement Store Manager, but in the end, he and the new Store Manager were able to

13   work well together, opting for a month-at-a-time approach to managing the store); *see*

14   *also* Ferrell Decl. at ¶¶ 7-10 & 19, Ex. 5 to Stafford Decl. (explaining that the prior Store

15   Manager had "established ways of doing things," but the new Store Manager was "laid

16   back and not as set in his ways," meaning that Ferrell "had a fresh start" and "took on

17   more responsibility for managing all areas of the store").

18          The declarations provided by Les Schwab also illustrate how the role of Assistant

19   Manager is different from store to store as a result of size, location, and mix of business.

20   *See* Maynard Decl. at ¶¶ 2 & 7-9, Ex. 16 to Stafford Decl. (describing his transfer from a

21   large store in Smokey Point with a thriving commercial business, where Maynard

22   operated with substantial autonomy, hiring employees and conducting performance

23

ORDER - 17

reviews on his own, to a much smaller retail store in Bellingham, where he works with a more hands-on Store Manager); _see also_ Bender Decl. at ¶¶ 3-11, Ex. 3 to Stafford Decl. (comparing the small retail store in Kent, where he was able to micromanage and "have a hand in everything," with the full-service store in Quincy,[12] which has a large volume of commercial sales, where he is required to delegate); Hesner Decl. at ¶¶ 4, 8, & 14, Ex. 11 to Stafford Decl. (discussing the change in duties upon moving from a small retail store in Tacoma to an Area Store in Vancouver, with four times as many employees).  The disparity between stores is further demonstrated in the declarations submitted by plaintiff,[13] which vary from no managerial involvement by the current Assistant Manager

-------------------

[12] _Cf._ Martin Decl. at ¶¶ 6 & 19, Ex. 15 to Stafford Decl. (Martin was Bender's predecessor at the Quincy store, and he states that the Store Manager of the Quincy store changed in early 2012, but the type of 50/50 partnership between the Store Manager and the Assistant Manager remained the same).

[13] Notably, very few of the 52 individuals who have provided declarations worked together.  Two declarants, however, who served as Assistant Managers at the same store, namely Store No. 334 in Longview, have contradictory recollections of their shared experiences.  _Compare_ Bodin Decl. (docket no. 22-3) _with_ Gamble Decl., Ex. 8 to Stafford Decl.  Bodin, who was the second Assistant Manager until January 1, 2013, and then served as a Sales & Service Professional until September 2013, represents that the Store Manager had responsibility for hiring and firing decisions and for conducting performance reviews, and that he was not involved, except for occasionally participating in reviews.  Bodin Decl. at ¶¶ 3 & 13.  In contrast, Gamble states that the Store Manager was out of the store 40-50% of the time, and that he and Bodin essentially ran the store together.  Gamble Decl. at ¶¶ 6 & 13.  Gamble indicates that both he and Bodin "took the lead on hiring," that he and Bodin would talk if an employee needed to be disciplined or fired and then whichever one of them was more familiar with the issue would raise it with the Store Manager, and that either he or Bodin would be in any termination meeting, along with the Store Manager.  _Id._ at ¶¶ 18 & 20.  Although the Court need not make any credibility determinations for purposes of the pending motion, the Court notes that Les Schwab has proffered evidence that Bodin was disciplined for failing to properly address the misconduct of an hourly employee and then failing to be forthcoming during a subsequent investigation.  Hueske Decl. at ¶ 35(3) & Ex. D.  Bodin was, however, successful later in making the "manager's list" and receiving an offer to be a Store Manager.  _Id._; Bodin Decl. at ¶ 6.  He did not accept the position because it would have required him to move to Denver, away from his children.  Bodin Decl. at ¶ 6.

at Store No. 417 in Bellingham, a commercial store requiring the Assistant Manager to spend substantial time on the road performing service calls, Medcalf Decl. at ¶¶ 3-4, 11, 14, & 18 (docket no. 22-18), to significant participation by the former Assistant Managers at Store Nos. 363 and 318 in North Bend and Battleground, respectively, in the hiring, firing, and performance review processes, Bawdon Decl. at ¶ 13 (docket no. 22-1); Blair Decl. at ¶ 18 (docket no. 22-2), to the current Assistant Manager at Store No. 378 in Federal Way, a store with a mix of retail and commercial business, spending as much as 40% of the work day on solely managerial functions, Harper Decl. at ¶¶ 6 & 16 (docket no. 22-10).

### 4.     Applicable Standard:  "Relative Importance" of Managerial Duties to Employer's Functioning

Plaintiff criticizes Les Schwab for failing to offer estimates concerning the portion of each day Assistant Managers devote to managerial activities.  The Court is not persuaded that a strict apportionment of time constitutes an appropriate method for analyzing the type of supervisory role at issue in this case.  *See Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982).  As observed by the First Circuit in *Donovan*, "one can still be 'managing' if one is in charge, even while physically doing something else." *Id.*  The facts of *Donovan* are similar to those at issue in this case.  As explained in *Donovan*, Burger King restaurants are staffed with a salaried manager, two salaried assistant managers, and a crew of hourly employees. *Id.* at 223.  The manager usually works during the day, and the assistant managers normally work either the swing or night shift. *Id.*  While on duty, an assistant manager is responsible for scheduling and training

ORDER - 19

1    employees, assigning work, recordkeeping and cash reconciliation, and overseeing

2    product quality and inventory; however, assistant managers also spend time performing

3    many of the same tasks as hourly employees, including taking orders, preparing food, and

4    distributing purchases to customers.  _Id._

5        The _Donovan_ decision concerns Burger King's appeal from the trial judge's

6    conclusion that, under the Fair Labor Standards Act ("FLSA"), overtime compensation

7    was owed to the assistant managers in the company-owned restaurants in Massachusetts

8    and Connecticut.  _Id._  With respect to assistant managers earning at least $250 per week

9    to whom the FLSA's "short test" applied, meaning that they would be "exempt" from

10   overtime requirements if _inter alia_ their "primary duty" was management, _see_ 29 C.F.R.

11   § 541.100(a) (the salary threshold is now $455 per week), the First Circuit rejected the

12   notion that "managing" must occupy over 50% of the work day to qualify as the "primary

13   duty."  _Id._ at 226.  The First Circuit reasoned that, in the context at issue, "a strict time

14   division" is "misleading."  _Id._  An individual "can manage while performing other work,"

15   and "this other work does not negate the conclusion that his primary duty is

16   management."  _Id._  The Court agrees with the First Circuit that apportionment should be

17   reserved for "situations where the employee's management and non-management

18   functions are more clearly severable."  _Id._

19       Moreover, under L&I's regulations, the precise amount of time spent performing

20   managerial work is not even a factor when the salary rate exceeds $250 per week, _see_

21

22

23

WAC 296-128-510(5)&(6); WAC 296-128-520(4),[14] and to the extent it is relevant, it is not dispositive, *see* *Reed v. City of Asotin*, 917 F. Supp. 2d 1156, 1162 (E.D. Wash. 2013).[15]  Rather, the key consideration in assessing whether an individual is exempt from Washington's overtime requirement is the "relative importance" of the individual's managerial responsibilities to "the functioning of the employer as a whole."  *Id.*  For example, in *Reed*, in which a former police chief sought overtime compensation, the court concluded that the plaintiff's managerial duties, which occupied only 40% of his time, but which included developing policies for the police department, assigning tasks to subordinates, evaluating officer performance and making recommendations to the mayor concerning promotion and discipline, participating in the budgeting process, and meeting with city council members, various officials, and the public, were "clearly central" or "crucial" to "the successful management and operation" of the police department.  *Id.* at 1162, 1164.

### 5.   Individual Issues Predominate

In this case, to assess whether plaintiff can establish on a class-wide basis that Assistant Managers play no significant managerial role, the Court must consider two

---

[14] When the salary rate is below $250 per week, however, and the individual works in a retail or service establishment, the individual must devote less than 40% of his or her time to activities that are "not directly and closely related" to the performance of executive or administrative functions to qualify for the overtime exemption.  WAC 296-128-510(6); WAC 296-128-520(4).

[15] In this respect, Washington law differs from California law, and plaintiff's reliance on cases decided by courts in California is misplaced.  As explained in *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, 2006 WL 2642528 (N.D. Cal. Sep. 14, 2006), the applicable California statute requires that an employee be compensated for overtime unless the employee spends more than one-half of his or her work time on duties that meet the test for an executive, administrative, or professional exemption.  *Id.* at *1 n.1 (quoting CAL. LAB. CODE § 515).

situations, one in which the Store Manager is absent and the other in which the Store Manager is present at the store.  In numerical terms, Store Managers might be absent as little as 10% of the year, considering authorized vacations and a day off in every 12 days of operation, and they can be gone up to 40% or 50% of the time, _see_ Gamble Decl. at ¶ 13, Ex. 8 to Stafford Decl.; Gonzalez Decl. at ¶ 10, Ex. 9 to Stafford Decl. (Area Store); Willingham Decl. at ¶ 21, Ex. 25 to Stafford Decl. (Area Store); _see also_ Flinner Decl. at ¶ 14, Ex. 6 to Stafford Decl. (Store Manager attended week-long annual meetings, quarterly area meetings, and monthly advertising meetings involving other nearby stores). In addition, the Store Manager position might be vacant for some period following a promotion, transfer, retirement, or discharge.[16]  When no Store Manager is present, the Assistant Manager's supervisory role is vital to the continued operation of the business. _See Donovan_, 672 F.2d at 227 ("the person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions").  Because, however, the extent to which Store Managers are absent varies by individual, store, and vacancy status, the Court cannot assess on a class-wide basis the "relative importance" of an Assistant Manager's temporary command of the store to "the functioning of the employer as a whole."

---

[16] _See_ Gamble Decl. at ¶ 4, Ex. 8 to Stafford Decl. (Assistant Manager ran the store for six months while Store Manager was being replaced); Martin Decl. at ¶ 9, Ex. 15 to Stafford Decl. (upon Store Manager's transfer, Assistant Manager was solely in charge for a month); Ruetsch Decl. at ¶ 6, Ex. 21 to Stafford Decl. (before retirement, Store Manager took two months of vacation, during which Assistant Manager operated the store on his own).

1    The same is true with regard to the periods during which Store Managers are

2    present at their stores.  The record before the Court reflects that the amount of discretion

3    given to Assistant Managers and the scope of their involvement in managerial decisions

4    fluctuate depending on the size, type, and location of the store, the supervisory style and

5    career phase of the Store Manager, and perhaps the capabilities and ambitions of the

6    individual Assistant Manager.  In support of his argument that the overtime exemption

7    analysis can be performed on a class-wide basis, plaintiff has cited no case in which the

8    level of variation demonstrated here gave rise to an order certifying a class.  For the most

9    part, the authorities cited by plaintiff concerning wage claims are distinguishable because

10   they involve non-exempt employees challenging the manner in which their earnings were

11   calculated or their hours were recorded.[17]  Plaintiff relies on only four cases involving an

12   alleged misclassification of class members for purposes of overtime compensation.  *See*

13   _____

14   [17] *See* *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952 (9th Cir. 2013) (regarding meal breaks);
     *Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) (challenging the practice of rounding
15   start times in 29-minute increments); *Khadera v. ABM Indus. Inc.*, 701 F. Supp. 2d 1190 (W.D.
     Wash. 2010) (alleging that employer forced employees to work "off the clock"); *Kirkpatrick v.*
16   *Ironwood Commc'ns, Inc.*, 2006 WL 2381797 (W.D. Wash. Aug. 16, 2006) (involving piece rate
     or piecework payment system); *see also* *Wang v. Chinese Daily News, Inc.*, 2014 WL 1712180
17   (C.D. Cal. Apr. 15, 2014) (asserting that employer had a policy of not paying overtime wages to
     non-exempt employees ); *Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585 (D. Or. 2013)
18   (concerning whether nurses should be compensated for study and test-taking time required for
     employment but not for maintaining their nursing licenses); *In re Taco Bell Wage & Hour*
19   *Actions*, 2012 WL 5932833 (E.D. Cal. Nov. 27, 2012) (claiming violations of meal and rest
     break requirements for a class of hourly employees); *Ramos v. SimplexGrinnell LP*, 796 F. Supp.
20   2d 346 (E.D.N.Y. 2011) (contending that current and former employees were not paid the
     "prevailing wage" on New York public works projects); *Arrendondo v. Delano Farms Co.*, 2011
21   WL 1486612 (E.D. Cal. Apr. 19, 2011) (alleging that non-exempt agricultural employees were
     required to perform off-the-clock work and were not reimbursed for work-related expenses);
22   *Lemus v. H&R Block Enters., LLC*, 2010 WL 5069695 (N.D. Cal. Dec. 7, 2010) (challenging the
     timing of payments made to seasonal, non-exempt employees who worked as tax preparers).

23

ORDER - 23

1   _Troy v. Kehe Food Distribs., Inc._, 276 F.R.D. 642 (W.D. Wash. 2011); _Whiteway v._

2   _FedEx Kinko's Office & Print Servs., Inc._, 2006 WL 2642528 (N.D. Cal. Sep. 14, 2006);

3   _Tierno v. Rite Aid Corp._, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006); _Sav-On Drug_

4   _Stores, Inc. v. Superior Court_, 96 P.3d 194 (Cal. 2004).  These decisions, however, do not

5   support certification of a class in this case.

6            In _Troy_, unlike in this case, the discretion of individual supervisors was not at

7   issue, and "no employee-by-employee analysis" was necessary to resolve the question of

8   whether the defendant properly classified merchandisers and sales representatives as

9   exempt from federal and state overtime requirements.  276 F.R.D. at 651, 654.  Similarly,

10  in both _Whiteway_ and _Tierno_, the differences in job duties and responsibilities among the

11  putative class members were minimal and did not defeat commonality.  _Whiteway_, 2006

12  WL 2642528 at *6; _Tierno_, 2006 WL 2535056 at *5-*7 (indicating that the defendant

13  exercised "a great deal of centralized control," that the store managers at issue "perform

14  essentially the same tasks at each store," and that the defendant "fosters homogeneity" in

15  "job duties, and the manner in which they are performed, by utilizing a system of close

16  supervision").  Finally, in _Sav-On_, the parties did not disagree about the "reasonably

17  definite and finite list" of tasks performed by the various operating managers and

18  assistant managers at issue, they simply disputed whether those tasks were properly

19  classified as "managerial" or "non-managerial."  96 P.3d at 202.  In contrast, in the

20  present case, the parties do not differ regarding which activities are managerial in nature;

21  rather, they offer divergent accounts of the duties delegated to or shared by Assistant

22

23

ORDER - 24

Managers and the extent to which those duties occupied the potential class members' work day.

Moreover, the fact that Les Schwab previously classified all Assistant Managers as exempt and recently reclassified them as non-exempt "does nothing to facilitate common proof on the otherwise individualized issues." *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009); *see also Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545-46 (9th Cir. 2013) (vacating class certification and remanding for reconsideration in light of *Wal-Mart*, reiterating that an employer's uniform application of an overtime exemption policy does not give rise to a presumption in favor of class treatment because such presumption "disregards the existence of other potential individual issues that may make class treatment difficult if not impossible" (quoting *In re Wells Fargo*, 571 F.3d at 958)).

Plaintiff's supplemental citation to *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014), also misses the mark. In *Jimenez*, the key common question susceptible of class-wide determination was whether class members, who were compensated on an hourly basis, worked uncompensated overtime as a result of the defendant's "unofficial policy of discouraging reporting of such overtime." *Id.* at 1163-64. The Ninth Circuit observed that proving the existence of such informal or unofficial policy at trial would "drive the resolution" of the class claim under the applicable three-prong test, which requires *inter alia* that the defendant "knew or should have known" the class members performed uncompensated work but "stood idly by." *Id.* at 1165-66 (citing *Adoma v. Univ. of Phoenix, Inc.*, 270 F.R.D. 543, 548 (E.D. Cal. 2010)). In this case, no suggestion

is made that Les Schwab paid Assistant Managers on an hourly basis during the proposed

class period or that, after converting Assistant Managers into non-exempt employees, Les

Schwab pressured them into foregoing overtime compensation.

**C.**   **Rule 23(b)(3) Class Inappropriate**

The Court concludes that plaintiff has not made the requisite showing of

commonality to warrant certification of a class under Rule 23(b)(3).[18]  Plaintiff's

underlying premise, namely that, despite the job description for Assistant Manager,

which would itself support the conclusion that Assistant Managers are exempt from

overtime requirements, he and all other Assistant Managers engaged primarily in manual

labor and other non-exempt tasks, is disputed by several of his former peers.  Plaintiff has

therefore failed to demonstrate any common factual or legal question that predominates

over individual issues.  _See Weston v. Emerald City Pizza LLC_, 137 Wn. App. 164, 151

P.3d 1090 (2007) (reversing an order certifying a class, observing that the job description

for the position at issue did not require the non-managerial work that formed the basis of

the plaintiff's claims and that the plaintiff's allegations did not establish the defendant

---

[18] Plaintiff's failure to show commonality is particularly obvious with respect to his claim under RCW 49.52.050, which is a criminal statute.  The Court will treat plaintiff's claim as brought instead under RCW 49.52.070, which authorizes a civil action for violation of subsections (1) or (2) of RCW 49.52.050.  _See Keenan v. Allan_, 889 F. Supp. 1320, 1378 n.80 (E.D. Wash. 1995). RCW 49.52.070 permits double recovery for "wages unlawfully rebated or withheld," but it explicitly defines as a defense an employee's knowing submission to the violation at issue.  _See also Ebling v. Gove's Cove, Inc._, 34 Wn. App. 495, 500-01, 663 P.2d 132 (1983) (a bona fide dispute concerning whether wages were owed also constitutes a defense to willful withholding within the meaning of RCW 49.52.050(2)).  Whether Assistant Managers knowingly submitted to receiving compensation on a salaried and profit-sharing basis and to forsaking overtime pay requires the type of individualized consideration that renders the class vehicle unsuitable.

ORDER - 26

1   "engaged in a common course of conduct in relation to all potential class members").

2   The Court is satisfied that, in this matter, a class action would not be "superior to other

3   available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P.

4   23(b)(3), and declines to certify the proposed class. *Cf. Stubbs v. McDonald's Corp.*, 227

5   F.R.D. 661 (D. Kan. 2004) (concluding, with respect to a proposed class of first and

6   second assistant managers of McDonald's restaurants in Kansas, that the plaintiff failed

7   to satisfy the more lenient standard for conditional class certification under the FLSA,

8   which requires a showing of "nothing more than substantial allegations that the putative

9   class members were together the victims of a single decision, policy, or plan").

10  **Conclusion**

11          For the foregoing reasons, plaintiff's motion for class certification, docket no. 20,

12  is DENIED.  The parties' stipulated motion, docket no. 35, to strike the trial date and all

13  related deadlines is DENIED.  The Court sua sponte EXTENDS the expert disclosure

14  deadline from November 5, 2014, to December 22, 2014, and the discovery completion

15  deadline from January 5, 2015, to January 30, 2015.

16          IT IS SO ORDERED.

17          Dated this 24th day of November, 2014.

18
19                                        _____
20                                        THOMAS S. ZILLY
                                          United States District Judge
21
22
23

ORDER - 27